[992 NYS2d 621]

GEORGE MORTON, Plaintiff, v 338 WEST 46TH STREET REALTY, LLC, Defendant. (And Four Other Actions.)

Civil Court of the City of New York, New York County, August 29, 2014

APPEARANCES OF COUNSEL

*Daniel R. Miller*, Brooklyn, for defendant.

*Bierman & Palitz LLP*, New York City (*Mark H. Bierman* of counsel), for plaintiff.

## OPINION OF THE COURT

LYNN R. KOTLER, J.

In these consolidated actions, the plaintiffs are tenants of five residential rent regulated apartments at a six-unit apartment building located at 338 West 46th Street (the building). Defendant, which owns the building, moves for an order determining the legal rent of plaintiffs' apartments. Plaintiffs cross-move for partial summary judgment to the extent of granting judgment in their favor on each of their eighth counterclaims and dismissing with prejudice defendant's first, second, third, fourth and fifth affirmative defenses and second and third counterclaims. Plaintiffs have provided calculations of their damages which range from approximately $2.4 million to $500,000, depending on the base date for the calculation of lawful rent. Issue is joined and notice of trial has not yet been filed, therefore summary judgment relief is available. The motions are decided as follows.

Procedural History

Prior to the commencement of this action, 1994 was the last year for which the building was registered with the Division of Housing and Community Renewal (DHCR) under rent stabilization. After taking title to the building on or about September 26, 2005, defendant commenced five holdover proceedings against plaintiffs in the Housing Part on the basis that it had properly terminated their month-to-month tenancies. Hon. Marcia Sikowitz dismissed the holdover proceedings, after a finding by DHCR Rent Administrator Jadwiga Krawczyk (RA Krawczyk) in an order and determination dated December 14, 2006 (the RA's 2006 order) that none of the apartments in the building are exempt from rent stabilization, and severed the plaintiff tenants' counterclaims for rent overcharges which are now the subject of the instant action.

In or about 2008, defendant commenced another proceeding before the DHCR to determine the same rent overcharge issue

that was then being litigated in Civil Court. By order dated December 12, 2008, the DHCR Rent Administrator dismissed the defendant's application since the tenants had previously asserted the claims in the Housing Part. Defendant's appeal of the RA's dismissal was denied by the DHCR Commissioner's order dated May 27, 2009. Defendant thereafter commenced a CPLR article 78 proceeding in Supreme Court, New York County, challenging DHCR's determination (*Matter of 338 W. 46th St. Realty, LLC v State of N.Y. State Div. of Hous. & Community Renewal*, 2010 NY Slip Op 31394[U] [Sup Ct, NY County 2010]). By decision/order dated May 28, 2010, Hon. Emily Jane Goodman denied defendant's petition and defendant appealed (*id.*). By decision/order dated December 6, 2012, the First Department affirmed Justice Goodman's decision (*Matter of 338 W. 46th St. Realty, LLC v State of N.Y. State Div. of Hous. & Community Renewal*, 101 AD3d 439 [1st Dept 2012]).

The instant motion and cross motion were originally argued before Hon. Andrea Masley, who issued a decision/order dated February 23, 2012 which granted the motion to the extent of referring plaintiffs' overcharge claims to DHCR and denied the cross motion without prejudice to renewal. By decision/order dated January 28, 2014, the Appellate Term, First Department, reversed Judge Masley and remanded the matter back to Civil Court "for a merits determination of the parties' respective cross motions" (*Morton v 338 W. 46th St. Realty, LLC*, 42 Misc 3d 135[A], 2014 NY Slip Op 50075[U], *1 [App Term, 1st Dept 2014]).

Since the motion and cross motion were originally submitted, but prior to remand, defendant claims that plaintiff George Morton, who was the tenant of apartment 2F at the building, died in February 2013. Defendant contends that Mr. Morton's claims should be dismissed and plaintiffs' attorney should be sanctioned. The court disagrees. While a motion for substitution should be made by Mr. Morton's successors or representatives (CPLR 1021), these motions were originally submitted while Mr. Morton was still alive. Given the unique procedural history of this case, the court will address the merits of the parties' arguments, including those advanced on behalf of Mr. Morton, since Mr. Morton was alive and presumably authorized the legal strategy which led to filing of the cross motion for summary judgment. Since the arguments advanced by plaintiffs on remand do not substantively deviate from those made by plaintiffs originally, there is no prejudice to a merits determination.

The court's treatment of this motion in light of Mr. Morton's death should not be viewed as approval of Mr. Morton's attorneys to litigate on his behalf now that he has passed away. Given the court's disposition of the cross motion, the court directs that a motion for substitution by Mr. Morton's successors or representatives be made within 90 days from the date of this decision/order.

Facts and Arguments

Mr. Morton lived in apartment 2F since 1992. Apartment 2F is a small studio. All other apartments in the building are one-bedroom apartments of equivalent size. Mr. Eisele has lived in apartment 3R from 1991 through the present. Mr. Leonardi has lived in apartment 4F from 1992 through the present. Ms. Schmidt has lived in apartment 3F from approximately July 1, 2002 through the present. Ms. Davis has lived in apartment 2R since approximately 1995 through the present.

During the period from approximately 1991 through 2007, none of the plaintiffs received rent registrations, a rent-stabilized lease or a rent-stabilized lease rider.

In the RA's 2006 order, the RA specifically found as follows:

> "[Defendant] filed an application for a determination that the [building] was exempt from regulation by virtue of its having undergone a substantial rehabilitation from 1991-1993. The work was done under the prior owner, John C. Horgan. Upon his death in 1994, Joanne Horgan, the daughter, took over the property. A new Certificate of Occupancy, No.103726, for converting the building from three to six units was issued on September 21, 1993 for work completed under Alteration #100245496 . . . .
>
> "[Defendant] has also stated and DHCR Building Registrations indicate that the building was vacant during the period 1986-1991 . . . .
>
> "[Plaintiffs], through counsel, opposed the application. They argue that [defendant] fails to demonstrate that the following systems were completely replaced with new systems: plumbing, heating, electrical wiring, interior stairways, kitchens, floors, ceilings and wall surfaces, and all doors and frames including the replacement of non-fire rated items with fire-rated ones.
>
> "Pursuant to Rent Stabilization Code Section 2520.11 (e) and Operational Bulletin 95-2, the build-

ing must meet two criteria to qualify for substantial rehabilitation.

''1) The rehabilitation must have been commenced in a building that was in a substandard or seriously deteriorated condition. The extent to which the building was vacant of residential tenants when the rehabilitation was commenced shall constitute evidence of whether the building was in fact in such condition.

''2) At least 75% of 17 specified building-wide and apartment systems must have been completely replaced with new systems.''

RA Krawczyk found that defendant could not establish that the building was vacant from 1986-1994 and therefore could not establish that it met the first criteria of substantial rehabilitation. As for the second prong, RA Krawczyk found that although defendant submitted evidence that ''extensive work was done,'' this work did not ''reach[ ] the level of a substantial rehabilitation within the meaning of the Rent Stabilization Code and Operational Bulletin 95-2.''

In or about 2008, the plaintiffs each received retroactive rent registrations from defendant. Plaintiffs rejected these registrations and proposed lease renewals because they ''did not reflect any rental agreements that [plaintiffs] had with the landlord and stated rent that was never agreed to or paid by [plaintiffs].''

Mr. Morton further states that at the time he moved into the building, ''neither the apartment nor the common areas of the building had been recently renovated, and certainly had not been substantially rehabilitated. Rather, the building, including the common areas and the apartments including my own, appeared not [to] have had any major work in decades.'' Mr. Morton observed in 1992 that apartment 2F was in the following condition: the paint was faded, dirty and peeling, the rugs were worn and dirty, the wood floors had not been renovated and/or were made using inferior materials, the wood moldings were original and the electric wiring was dated and dangerous. Mr. Morton concludes that the building, ''in general is in need of repair in a way that reflects that the building could not have possible [sic] been substantially rehabilitated at the time claimed.''

The remaining plaintiffs' claims regarding the condition of the apartment are otherwise generally consistent with Mr. Morton's observations.

Plaintiffs urge this court to adopt the so-called *Thornton* default formula (*see Thornton v Baron*, 5 NY3d 175 [2005]) and therefore, the base rent "should be the lowest legal registered rent charged for a similar apartment." Plaintiffs further argue that they have established through admissible evidence that defendant's predecessor-in-interest "scheme[d] to improperly deregulate the apartments, [and therefore] the Court should adopt as the Base Rent, the last lawful regulated rent" which is more than four years prior to the commencement of this action.

Plaintiffs also maintain that defendant failed to properly assert statute of limitations as a defense, and therefore, that defense is waived.

Defendant has provided an affidavit and supplemental affidavit by Paul Lee, managing member of defendant. Mr. Lee vehemently maintains that "no fraud was perpetrated by the defendant or its predecessor-in-interest upon the plaintiffs." Mr. Lee states in pertinent part:

> "[T]his property had registrations with rent stabilization up until 1993 when the original owner of the property died. Thereafter, his daughter took over management of the building as trustee through a testamentary trust left by her father. This is the point at which the apartments were no longer registered for many years up until 2005 when the building was sold to me. During that time . . . the rent increases were minimal and no actions were taken by the defendant's predecessor-in-interest to evict any of these tenants."

Mr. Lee has provided sale listings for comparable apartments in the market which show that "the[ ] rents [paid by plaintiffs] are far below what other stabilized similar apartments would be going for in this community."

Mr. Lee further states that when defendant purchased the property, "[he] was given leases at the closing and it was represented and believed by the former owner that the apartments were not stabilized."

Finally, Mr. Lee argues that even if plaintiffs could show a fraudulent scheme by either defendant or the predecessor owner, plaintiffs' voluntary payments of rent since they interposed their rent overcharge claims "establishes the fact that these payments were made voluntarily by the tenant" and an award of treble damages in favor of plaintiffs would result in an unjust windfall.

Finally, Mr. Lee disputes the accuracy of plaintiffs' calculation of damages, contends that numerous months passed where plaintiffs did not pay rent (particularly Dec. 2005-Apr. 2006), that Mr. Morton has not paid rent since December 2012, that plaintiff Ute Schmidt "does not live in her apartment and sublets her apartment to German tourist [sic] and others to make profit" and otherwise has not paid rent since July 2013.

Discussion

On a motion for summary judgment, the proponent bears the initial burden of setting forth evidentiary facts to prove a prima facie case that would entitle it to judgment in its favor, without the need for a trial (CPLR 3212; *Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851 [1985]; *Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]). Only if it meets this burden, will it then shift to the party opposing summary judgment who must then establish the existence of material issues of fact, through evidentiary proof in admissible form, that would require a trial of this action (*Zuckerman v City of New York*). If the proponent fails to make out its prima facie case for summary judgment, however, then its motion must be denied, regardless of the sufficiency of the opposing papers (*Alvarez v Prospect Hosp.*, 68 NY2d 320 [1986]; *Ayotte v Gervasio*, 81 NY2d 1062 [1993]).

Granting a motion for summary judgment is the functional equivalent of a trial, therefore it is a drastic remedy that should not be granted where there is any doubt as to the existence of a triable issue (*Rotuba Extruders v Ceppos*, 46 NY2d 223 [1978]). The court's function on these motions is limited to "issue-finding," not "issue-determination" (*Sillman v Twentieth Century-Fox Film Corp.*, 3 NY2d 395, 404 [1957]). When only issues of law are raised in connection with a motion for summary judgment, the court may and should resolve them without the need for a testimonial hearing (*Hindes v Weisz*, 303 AD2d 459 [2d Dept 2003]).

The base date for determining the lawful rent is four years prior to the date that the complaint of rent overcharge is made (*see* Rent Stabilization Law of 1969 [Administrative Code of City of NY] § 26-516 [a]). In this case, the base date is January 4, 2002. Therefore, generally, the legal regulated rent is set at the base date plus any subsequent lawful increases (Rent Stabilization Code [9 NYCRR] §§ 2520.6 [e], [f] [1]; 2526.1 [a] [3] [i]). There is a common-law exception to the four-year look-back period, which is triggered if the landlord set the rent as part of a fraudulent scheme. Only where there is a "colorable"

claim of fraud may the rental history outside the four-year period be examined (*see Matter of Grimm v State of N.Y. Div. of Hous. & Community Renewal Off. of Rent Admin.*, 15 NY3d 358, 364 [2010]; *Thornton v Baron*, 5 NY3d 175, 180 [2005]).

A colorable claim of fraud requires that the tenant present something more than a mere allegation of fraud. It requires some evidence that the owner engaged in a fraudulent act or scheme more than four years prior to the tenant's filing of the rent overcharge claim, justifying the agency's examination of the entire rent history (*Matter of Boyd v New York State Div. of Hous. & Community Renewal*, 110 AD3d 594, 597 [1st Dept 2013, Gische J., dissenting (citing *Matter of Grimm*, 15 NY3d at 367)], *revd* 23 NY3d 999 [June 26, 2014]).

Plaintiffs' argument that defendant's "statute of limitations" defense is waived is rejected by the court. The burden was not on defendant to show that a four-year statute of limitations applies, but rather, the burden is on plaintiffs to show that the court should look back beyond the applicable four-year rent history to determine base rent. Rent Stabilization Law § 26-516 (a) states:

> "[T]he legal regulated rent for purposes of determining an overcharge, shall be the rent indicated in the annual registration statement filed four years prior to the most recent registration statement, . . . plus in each case any subsequent lawful increases and adjustments. Where the amount of rent set forth in the annual rent registration statement filed four years prior to the most recent registration statement is not challenged within four years of its filing, neither such rent nor service of any registration shall be subject to challenge at any time thereafter."

Similarly, defendant's claims that it should not be held liable for rent overcharges because it did not have knowledge of any overpayments of rent made by plaintiffs at the time it acquired title are of no moment. The new owner of a residential property is under a legal obligation to secure from its predecessor complete rental histories and payment records for all tenants, so that the legal rents may be appropriately established so that subsequent increases may be correctly calculated (*see i.e. Carol Turner, 308 Realty v Spear*, 134 Misc 2d 733 [Civ Ct, NY County 1987]). Further, the new owner can protect itself from liability for rent overcharges as a result of its predecessor's actions at the time of purchase.

On this record, this case is not ripe for summary adjudication. It is clear that plaintiffs' apartments are subject to rent stabilization. However, it is undisputed that some renovation work was done. Whether defendant's predecessor-in-interest knew or should have known that the work done was not a substantial renovation, and thereby improperly concluded, is unclear on this record. Here, there is a triable issue of fact as to whether the predecessor owner engaged in a fraudulent scheme to deregulate the building or simply made a good faith error (*see i.e. Boyd v New York State Div. of Hous. & Community Renewal*, 23 NY3d 999, 1000-1001 [June 26, 2014] [tenant failed to "set forth sufficient indicia of fraud to warrant consideration of the rental history beyond the four-year statutory period"]).

It is true that defendant's predecessor-in-interest did not apply for exemption from rent regulation prior to 2006. However, in Operational Bulletin 95-2, which was issued December 15, 1995, DHCR admits that "uncertainty" about DHCR procedures concerning exemption based upon substantial rehabilitation made this process "difficult for applicants" (NY St Div of Hous & Community Renewal Operational Bulletin 95-2 at 1). Operational Bulletin 95-2 provides in pertinent part:

> "[Operational Bulletin 95-2] is being issued at this time to clarify the procedures the agency will use to determine issues of exemption from rent regulation due to substantial rehabilitation. [DHCR] has not previously issued any formal directive or clarification on this subject and the lack of such guidance has made it difficult for applicants to have an understanding of how an application for exemption will be treated. Also, potential applicants have indicated that uncertainty about our procedures could contribute to an unwillingness to undertake substantial rehabilitation projects in deteriorated buildings." (*Id.*)

The fraud exception to the four-year look-back period was judicially created to thwart a landlord's wrongdoing. On this record, there is insufficient information for the court to conclude that the predecessor landlord engaged in the type of wrongdoing, which the fraud exception was designed to protect against (*Matter of Grimm*). Apart from RA Krawczyk's findings in the 2006 RA order, the court has no information before it about the scope of the work that was done from 1991-1993. Indeed, if the work was such that the predecessor landlord knew or should have known that it would not lead to exemption from rent regulation, plaintiffs will have established

a colorable claim of fraud. However, RA Krawczyk did not make such a finding, because that issue was not before her.

In *Matter of Myers v D'Agosta* (202 AD2d 223 [1994]), the First Department upheld DHCR's determination that a landlord did not willfully overcharge the subject tenant because the landlord's belief that substantial renovations to the apartment permitted it to charge a free market rent was "rational" and was based on "a misconception that was widespread and not clarified until 1987, when the Division issued a ruling that renovations did not qualify an apartment for a free market first rent unless the boundary walls of the apartment were moved" (*id.* at 224). Here, a new certificate of occupancy was issued on September 21, 1993 converting the building from three to six units. Indeed, RA Krawczyk found that "most of the walls, moldings, wainscoting and ceilings in the apartments, stairways and public hallways are original," which indicates that some of the boundary walls may have been moved. Without knowing the scope of the work performed, the court cannot determine whether the predecessor landlord's conduct was part of a fraudulent scheme or merely a rational business decision to improve the building based on a widespread misconception of that time.

The First Department essentially upheld DHCR's administrative policy of allowing a first market rent where the perimeter walls of the previous apartment have been substantially changed and moved because "the previous apartment, essentially, ceases to exist" (*Matter of 300 W. 49th St. Assoc. v New York State Div. of Hous. & Community Renewal, Off. of Rent Admin.*, 212 AD2d 250, 253, 255 [1st Dept 1995] ["In the instant case, (RSC) § 2522.4 specifically provides for an adjustment of rent when specific types of work are performed by the Landlord. However, in those cases where the prior rent history of the apartment can no longer be utilized because that prior apartment no longer exists, the DHCR has adopted a rational policy under which a 'first rent' may then be charged. It must be noted that the DHCR's policy of allowing a first market rent has been implemented by both the Conciliation and Appeals Board and the DHCR on numerous occasions"]). Clearly, defendant cannot now argue that its predecessor-in-interest was permitted to charge a free market rent, since DHCR has already found that the apartments are not exempt from rent stabilization and that determination is res judicata. That does not, however, preclude defendant from attempting to prove at trial that charging a free market rent was a good faith mistake, rather than part of a fraudulent scheme to deregulate the apartments.

The court may look at the rent history beyond the look-back period for the limited purpose of determining whether the landlord was indeed engaged in a fraudulent scheme to deregulate the subject apartments (*Matter of Grimm*). Here, plaintiffs' rent payments do not reflect sizeable increases which would be indicia of fraud. During the period of May 1992 through August 2011, Mr. Morton paid to defendant the following as rent: May 1992-April 1994—$580; May 1994-April 1997—$600; May 1997-December 1999—$620; January 2000-May 2003—$720; June 2003-May 2004—$820; June 2004-June 2005—$845; July 2005-August 2011—$870. Mr. Eisele paid the following amounts for rent for apartment 3R: May 1991-April 1993—$650; May 1993-April 1995—$700; May 1995-April 1996—$725; May 1996-April 1997—$750; May 1997-April 1999—$775; May 1999-December 2000—$850; January 2001-December 2001—$960; January 2002-August 2011—$1,000. Mr. Leonardi paid the following amounts for rent for apartment 4F: January 1992-May 1997—$650; June 1997-May 1999—$700; June 1999-May 2003—$775; June 2003-December 2004—$850; January 2004-August 2011—$875. Ms. Schmidt paid the following amounts for rent for apartment 3F: July 2002-May 2003—$1,250 and June 2003-August 2011—$1,275. Finally, Ms. Davis paid the following amounts for rent for apartment 2R: May 1997-December 2001—$800 and January 2002-August 2011—$950. Indeed, a reasonable factfinder could conclude that plaintiffs' rent payment history is contraindicative of a fraudulent scheme on the part of the predecessor landlord to remove the building from rent regulation since the increases were incremental and, further, the rent it was collecting from plaintiffs was indeed below market at that time.

Plaintiffs' claims that they never received rent registrations, rent-stabilized leases or rent-stabilized lease riders do not require a different result. Mr. Eisele claims to have been living in the building since 1991 and Mr. Morton and Mr. Leonardi claim to have lived there since 1992. The only proof of these claims is the plaintiffs' own statements. RA Krawczyk noted that "[a]ccording to the 1994 registration, the last year for which the building was registered with [DHCR], tenants Eisele and Leonardi were living in the building." On this record, plaintiffs' claims concerning when and how they first took occupancy requires credibility determinations at trial, which are

beyond the purview of a motion for summary judgment. Moreover, the fact that the predecessor owner failed to register the units with DHCR does not, standing alone, give rise to a rent overcharge claim (Rent Stabilization Code [9 NYCRR] § 2506.1).

Even if plaintiffs did establish that the fraud exception to the look-back period should be applied, plaintiffs have not submitted admissible evidence of their rental payments to support their calculation of damages, they have not explained their failure to do so, and the defendant has raised several issues of fact concerning plaintiffs' calculations which would warrant a trial on damages. Finally, the issue of whether the predecessor landlord's overcharge was willful or based on a good faith error bears on plaintiffs' claim for treble damages (*see Housing Dev. Assoc. LLC v Gilpatrick*, 27 Misc 3d 134[A], 2010 NY Slip Op 50740[U] [App Term, 1st Dept 2010]), which is a remaining issue of fact.

Accordingly, plaintiffs' cross motion for partial summary judgment must be denied.

Conclusion

In accordance herewith, it is hereby ordered that plaintiffs' cross motion is denied in its entirety; and it is further ordered that the court directs that a motion for substitution by Mr. Morton's successors or representatives be made within 90 days from the date of this decision/order. Any requested relief not expressly addressed herein has nonetheless been considered and is hereby expressly denied.